IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____


LEATHEM STEARN, individually,
UTE MESA LOT 1, LLC, a Colorado Limited Liability Company
UTE MESA LOT 2, LLC, a Colorado Limited Liability Company

       Plaintiffs,

v.

WESTMORELAND EQUITY FUND LLC, a Delaware Corporation,
ED RYAN, individually, and
BERNARD FELDMAN, individually.

       Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs, by and through their attorneys, Podoll & Podoll, P.C., as their Complaint and Jury Demand against the above named Defendant state and allege as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Leathem Stearn ("Stearn") is an individual and resident of the State of Colorado with a principle address of 999 South Ute Avenue, Aspen, Colorado 81611.

2.    Plaintiff Ute Mesa Lot 1, LLC ("Ute 1") is a Colorado limited Liability Company in good standing with its principle business address in Colorado at 1001 South Ute Avenue, Aspen, Colorado 81611.

3.      Plaintiff Ute Mesa Lot 2, LLC ("Ute 2") is a Colorado limited Liability Company in good standing with its principle business address in Colorado at 1011 South Ute Avenue, Aspen, Colorado 81611.

4.      Stearn is the manager and sole member of Ute 1 and Ute 2.

5.      Defendant Westmoreland Equity Fund LLC ("WEF") is a Delaware Corporation with its principle business address at 1650 Market Street, 36th Floor, Philadelphia, Pennsylvania 19103.

6.      Defendant Ed Ryan ("Ryan") is an individual and managing member of WEF and, on information and belief is a resident of the State of Pennsylvania with a business address in Pennsylvania at 1650 Market Street, 36th Floor, Philadelphia, Pennsylvania 91903.

7.      Defendant Bernard Feldman ("Feldman") is an individual and is a resident of the State of Florida, with a principle address in Florida at 7234 Panache Way, Boca Raton, Florida 33433.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens and residents of the State of Colorado.  Defendant WEF is a Delaware corporation.  Defendant Feldman is a resident of the State of Florida.  Defendant Ryan, on information and belief, is a resident of the State of Pennsylvania.  On information and belief, none of the members of Defendant WEF are residents of the State of Colorado. The amount in controversy between the parties exceeds $75,000 exclusive of interest and costs.

9.      The exercise of *in personam* jurisdiction over Defendants WEF, Ryan and Feldman is based upon Colorado's long arm statute, C.R.S. § 13-1-124(1)(a)(transaction of business in Colorado) and/or (b) (commission of a tortious act within the statute of Colorado.)

10. The following facts, described in more detail below, support the exercise of specific jurisdiction over WEF, Ryan and Feldman based on the transactions and conduct at issue in this case and in accordance with due process:

    a. Plaintiffs contacted WEF through a broker for purposes of obtaining multi-million dollar financing, including construction financing, for two high-end properties located in Aspen, Colorado valued at between $50-$70 million;

    b. Plaintiffs, through Stearn and his counsel, and by means of telephonic communications and email communications, negotiated with representatives of WEF, including primarily Ryan and WEF's counsel, regarding the terms of several agreements, including letters of intent and loan commitments, which agreements related to Colorado real estate and which were to be secured by such real estate;

    c. In the course of negotiating letters of intent, loan commitments and engaging in due diligence, email communications were sent by WEF, Ryan and Feldman to Stearn who Defendants knew at the time of such communications was in Colorado;

    d. In the course of negotiating letters of intent, loan commitments and in the course of WEF's due diligence, telephone communications were initiated by Ryan and Feldman to Stearn who Defendants knew at the time of such communications was in Colorado;

    e. Ryan represented that WEF had the present ability and experience to conduct due diligence on the necessary timetable and that WEF had the present financial ability to make the loans contemplated by the parties. These representations were false, were directed at Colorado residents, and constituted tortious conduct which caused injury in Colorado.

    f. In the course of negotiating letters of intent, loan commitments and in the course of WEF's due diligence, drafts of letters of intent and loan commitments were sent to Plaintiffs and their counsel in Colorado for review and approval. WEF, Ryan and their representatives knew at the time such drafts were exchanged that Plaintiffs were in Colorado;

    g. Final letters of intent and loan commitments were sent to Plaintiffs in Colorado by email for signature and those agreements were signed by Plaintiffs in Colorado and returned to WEF by e-mail;

h.  The letters of intent and loan commitments that were negotiated were signed by WEF and Plaintiffs and required that over $235,000 be wired to WEF as advance lender fees and Plaintiffs, in fact, wired over $235,000 to Defendant in conjunction with the loan commitments;

i.  Ryan represented that the substantial advance lender fees were necessary since WEF was freezing the capital necessary to fund the loans, this representation was false, was directed at Colorado residents, and constituted tortious conduct which caused injury in Colorado

j.  Pursuant to the requirements of the loan commitments and as part of WEF's  due diligence, Plaintiffs uploaded documents to Dropbox, and WEF, Ryan and WEF's agents and employees, including Feldman, accessed numerous documents relating to the status of the properties that were to act as security for the loans to be made by WEF, as well as private financial information regarding Stearn;

k.  WEF and Ryan retained Defendant Feldman, purportedly as an independent agent, who traveled to Colorado for the benefit of WEF and Ryan to inspect the Aspen properties, perform due diligence and interview with Stearn regarding the loan commitments and properties at issue in this case.

l.  WEF, Ryan and Feldman, in truth, had entered into a conspiracy to defraud Plaintiff through the loan scam described in this Complaint. Feldman was the face of the scam and specifically brought the conspiracy to Colorado.

m. Through Feldman, Defendants came to Colorado and conducted business in Colorado;

n.  The loan commitments were substantial, involving more than $36 million.

o.  WEF retained an agent in Colorado to appraise the properties which were the subjects of the loan commitments and which appraiser traveled to Aspen, Colorado and met with Stearn for purposes of completing an appraisal.

p.  WEF, Ryan and Feldman purposefully chose to cause important consequences in Colorado and represented to Plaintiffs that WEF was considering loaning Plaintiffs $36 million using the Ute 1 and Ute 2 Homes as security for such loans.

q. Representations made by Ryan concerning WEF's, and his, ability to evaluate the prospective loan, conduct due diligence and fund the contemplated loans, were false and were intended to induce Plaintiffs to pay advance lender fees of over $235,000 to WEF.

r. When it entered into the loan contracts, WEF and Ryan had the present intent not to fund the loans, failed to advise Plaintiffs as to their secret intent, and induced Plaintiffs to enter into the loan contracts and pay substantial and excessive advance lender fees that WEF and Ryan intended to convert.

s. Feldman participated in the loan scam by interviewing Stearn, inspecting the properties, and then later supporting WEF's and Ryan's pretextual grounds for terminating the loan commitments.

t. WEF's, Ryan's and Feldman's tortious conduct caused damages to Plaintiffs in Colorado.

## INTRODUCTION

11. Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

12. This case arises out of Plaintiffs' efforts to obtain financing for two high-end residential properties located in Aspen, Colorado. The two homes are contained within a two-home complex at the bottom of Aspen Mountain. The complex includes common grounds and a gatekeeper house.

13. Plaintiffs were attempting to obtain two separate loans: (1) bridge financing to take out an expensive private money loan on one of the homes pending sale or permanent financing; and (2) a construction loan to complete construction of the second home.

14. Defendant WEF and Defendant Ryan were contacted by a broker retained by Plaintiffs.

15. From the outset, WEF and Ryan never intended to make a loan to Plaintiffs.

5

16.     Instead, they saw Plaintiff Stearn as a mark, someone who was in urgent need of financing for his business and who could be misled by what appeared to be a legitimate transaction, despite Stearn's efforts to vet WEF.

17.     WEF's and Ryan's represented willingness to make a loan was a scam.  Their goal from the outset was to engage Plaintiffs and induce them to enter into loan transactions by offering extremely favorable terms for a private lender, primarily the interest rate of the proposed loans, in order to induce Plaintiffs to advance lender fees in the amount of approximately $235,000, which WEF intended to retain without funding the loans.

18.     WEF's and Ryan's plan from the outset was to legitimize the anticipated loan transactions by engaging in what purported to be appropriate due diligence, retaining an appraiser to value the properties at issue and even sending its own purported "independent" agent, Defendant Feldman, to Colorado to inspect the properties involved and to interview Plaintiff Stearn.

19.     However, Defendants' actions were a façade designed to carry out a sophisticated scam.  The "due diligence" was perfunctory and never intended to be legitimate.

20.     Defendant Feldman was the face of the scam and he traveled to Colorado to carry out illusory due diligence to mask the true fraudulent intent of Defendants.

21.     Ryan and WEF and/or WEF's alleged "underwriting department" even failed to review documentation disclosed by Plaintiffs.  Then, Ryan later relied upon such documents to claim a breach of the loan commitments by Plaintiffs.

22.     From the outset, no matter what the terms of any loan commitments provided, WEF and Ryan intended to undermine the transactions by using any pretext they could before

loan closing to claim that Plaintiffs had breached the commitments so that WEF could retain the substantial advance lender fees they had induced Plaintiffs to pay.

23.     In keeping with their plan, that is exactly what WEF and Ryan did:  they waited until after the contractual closing date for the loans and then claimed Plaintiffs breached the loan commitments and that WEF was keeping the advance lender fees as a result.   They used Defendant Feldman to help justify the termination by having him prepare a "report" disingenuously detailing the alleged breaches and the reasons for termination of the loan commitments.

24.     The truth is, there was no breach of any of the terms of the loan commitments by Plaintiffs. The loan commitments were a sham. WEF and Ryan never intended to perform them, and WEF and Ryan effectively used the loan commitments as a subterfuge to steal Plaintiffs' money.  Defendant Feldman knew of the scam and played his part by giving a written report purporting to justify WEF's and Ryan's conduct.

25.     WEF and Ryan failed to disclose that they had no intent of completing a loan transaction.   WEF and Ryan also failed to disclose that they intended to utilize the loan transaction as a means of obtaining advance lender fees which they never intended to return and always intended to keep.

26.     As a result of being fraudulently induced to enter into two separate loans commitments, Plaintiffs have been damaged in an amount exceeding $230,000, exclusive of pre-judgement interest.

27.     Although there are significant facts supporting Plaintiffs' tort claims in this case as alleged below, Plaintiffs have pled, as an alternative claim, a breach of the loan commitments and a breach of the duty of good faith and fair dealing by WEF.

## GENERAL ALLEGATIONS

28.     Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

29.     In 2007-2008, Stearn acquired and entitled real property in Aspen, Colorado for purposes of building two large, high-end ski-in/ski-out residential mountainside homes adjacent to one another at the bottom of Aspen Mountain.  The two homes, 1001 Ute Avenue, Aspen, Colorado and 1011 Ute Avenue, Aspen Colorado, share common areas such as a large garage, landscaping and amenities such as tennis courts and a gatekeeper house.

30.     The homes are titled in the name of two separate limited liability companies: Plaintiff Ute 1 (1001 Ute Avenue); and Plaintiff Ute 2 (1011 Ute Avenue).  The homes will be separately referred to as the "Ute 1 Home" and the "Ute 2 Home" and collectively referred to as the "Homes."

31.     Stearn obtained separate financing on the Ute 1 Home and the Ute 2 Home from separate lenders:  United Western Bank ("UWB") for the Ute 1 Home and Alpine Bank for the Ute 2 Home.

32.     In 2009, Stearn had a dispute with UWB over its conduct in terminating its construction loan financing for the Ute 1 Home and its misrepresentations about UWB's contract performance and lending practices, largely motivated by UWB's failure to maintain regulatory compliance and its attempt to delay its own inevitable failure and takeover by federal regulators.

33.     UWB's regulatory compliance issues, its refusal to fund construction financing and misrepresentations to Stearn regarding its lending policies, led to mechanic liens being filed against the Ute 1 Home.

34.     In 2010, UWB filed a lawsuit against Stearn and Ute 1 in Pitkin County District Court ("Pitkin Case") claiming Stearn and Ute 1 breached the loan agreement and seeking to, among other things, foreclose the property and establish UWB's priority over mechanic lien claimants.  Stearn and Ute 1 filed counterclaims.

35.     When UWB filed the Pitkin Case against Stearn and Ute 1, it also filed a *lis pendens* which provided notice to third parties of the pending suit. Under Colorado law, a *lis pendens* is not a lien.

36.     The Pitkin Case, the impending failure of UWB, and UWB's conduct as a result, had significant impact on the two Home project as a whole.  It delayed construction, made it difficult to deal with contractors and impacted the financing with Alpine Bank on the Ute 2 Home.

37.     Ute 1 was forced to file a Chapter 11 Bankruptcy ("Bankruptcy Case").

38.     Within about 8 months of filing the Pitkin Case against Stearn and Ute 1, UWB was taken over by the Federal Deposit Insurance Corporation. UWB's assets were then sold to First Citizens Bank and Trust who continued the Pitkin Case.

39.     As a result of UWB's actions, and the manner in which the two Homes share common elements, Ute 2 was forced to find other financing, including construction financing, from a private money lender at above market interest rates and on unfavorable terms in order to take out Alpine Bank and complete the Ute 2 Home.

40.     Eventually, the Pitkin case was largely resolved by payment of damages by a title insurance company that issued a policy on the Ute 1 Home which had been paid for by Stearn.

41.     Although a *lis pendens* was still in place on the Ute 1 Home in conjunction with the Pitkin Case, the ultimate damages that were recoverable against Stearn and/or Ute 1, if any, were reduced from about $6.7 million to about $860,000.

42.     Throughout 2015, Stearn was working on having the *lis pendens* removed.

43.     In late 2015, Stearn contacted a loan broker to look for needed funding, primarily on the Ute 2 Home.  Although Stearn had not dealt with the broker before, the broker represented he had contacts, had dealt with similar situations and could help locate the necessary funding.  The broker would be paid a commission if an acceptable loan transaction was located and funded.

44.     In or about November, 2015, Stearn is informed and believes the loan broker approached WEF about a $22 million bridge loan to take out the expensive private money lender for the Ute 2 Home pending a sale or placement of a permanent term loan.

45.     There was urgency in finding such financing since the private money loan on the Ute 2 Home was due to be paid by the end of January, 2016, (which date was later extended to March 31, 2016), otherwise that loan would be in default and the private lender would be entitled to enforce certain remedies against the Ute 2 Home which became effective upon default.

46.     On or about November 27, 2015, after several conversations with Defendant Ryan about the prospective loan on the Ute 2 Home, Stearn submitted an application for the loan with WEF in the amount of $22 million for financing to take out the private money loan on the Ute 2 Home.

47.    WEF and Ryan falsely represented that they would engage in due diligence and, provided the due diligence met their terms, they would fund a $22 million loan (later increased to $25 million) or refund Plaintiffs' advance lender fees.  However, WEF and Ryan never intended to make a loan to Stearn and Ute 2, nor did they intend to return the exorbitant lender fees they extracted from Stearn

48.    The due diligence they performed wasn't serious; it was merely perfunctory.  It was designed to make WEF's and Ryan's conduct and representations appear legitimate. Defendant Feldman played the role of a purported independent agent of WEF to give the illusion of actual due diligence by traveling to Colorado, meeting with Stearn and inspecting the properties.  Meanwhile, significant documentation regarding Ute 2 and the Ute 2 Home that was disclosed was simply ignored.

49.    WEF and Ryan intended to induce Stearn and Ute 2 to enter into a loan commitment transaction and pay advance lender fees. WEF and Ryan intended to later "blow up" the transaction and blame Plaintiffs for breaching the loan commitment so the advance fees could be retained under the terms of the loan commitments drafted by WEF and Ryan.  They planned on using Feldman and help justify their conduct so they could keep the substantial advance fees.

50.    WEF's and Ryan's secret intent was never disclosed to Plaintiffs.

51.    WEF and Ryan were advised at the outset about the need to close the loan by February 1, 2016 (and later by March 15, 2016), because of the maturity of the loan with the private money lender for the Ute 2 Home. If the loan was not going to be made by WEF, Stearn would need some time to secure alternative take out financing.

52.    Stearn made it clear in conversations with Ryan in November and December, 2015, that April 1, 2016 was a drop dead date for any refinancing.  Ryan represented that he and WEF had significant experience in the high end real estate market and would be able to complete due diligence timely, provided that Stearn and Ute 2 signed a letter of intent and a subsequent loan commitment, paid the requisite lender fee, and other required fees, and provided the due diligence materials in a timely manner.

53.    Ryan advised that any agreed upon loan commitment would have to be accompanied by a lender fee based on a percentage of the total loan commitment.

54.    Plaintiffs were concerned about paying the substantial advance lender fees, and other fees, that WEF and Ryan were demanding as part of WEF's purported loan commitment. Ryan represented that the substantial lender fees were necessary since WEF placed a hold on the funds to be lent and the advance fees reflected the non-use of the capital during the due diligence period before loan disbursal.

55.    In an attempt to vet WEF, Plaintiffs, through counsel, requested that WEF provide some references, particularly in Colorado, where WEF's website indicated that it had closed loan transactions in the multi-millions of dollars.

56.    WEF and Ryan claimed they could not provide references because of non-disclosure agreements with its borrowers, but it did provide the name of what it claimed was an escrow agent it had worked with on numerous other loan transactions and the name of an organization in which it was a member.

57.     Neither "reference" was substantive: the "escrow agent" turned out to be the bookkeeping arm of WEF (not an independent escrow company) and the organization in which WEF was a member could only confirm WEF's recent membership.

58.     Nevertheless, as designed, WEF's and Ryan's scheme appeared legitimate.  They had requested significant documentation as part of a purported due diligence analysis.  Stearn contained to negotiate with Ryan.

59.     As part of the negotiations, Stearn insisted that any letter of intent and any loan commitment provide that any money advanced by Plaintiffs for any lender fees was refundable to Plaintiffs if the loan did not close.  Third party costs, like appraisal and environmental reports, the parties agreed, would be paid by borrower and would not be refundable.

60.     Ryan agreed, provided that WEF did not terminate the loan commitments as a result of any breach of the loan commitment by Ute 2.  Ryan failed to advise Stearn that WEF intended to claim such a breach even before the lender fee was tendered or the parties undertook performance of the terms of any loan commitment.

61.     In late November, 2015, and early December, 2015, Ryan, in discussions with Stearn concerning the Ute 2 Home, inquired as to the status of the adjacent unfinished Ute 1 Home.

62.     Stearn advised that about $11 million in construction financing was needed to complete the Ute 1 Home and that of course having two completed homes was preferred because it would help in the eventual marketing and sale of one or both Homes.

63.     Nevertheless, Stearn advised Ryan that a construction loan on the Home the Ute 1 Home would be a more difficult proposition because of the Pitkin Case, the *lis pendens* filed in conjunction with that case and the Ute 1 Chapter 11 Bankruptcy Case.

64.     In telephone conversations in late November, 2015 and early December 2015, Ryan, however, represented that such a loan to Ute 1 was not a problem, and that WEF, as a private equity lender, had significant experience in dealing with issues like those affecting the Ute 1 Home. Indeed, WEF's website contained the same type of representations.   Ryan encouraged Stearn to submit an application for construction financing on the Ute 1 Home.

65.     On information and belief, Ryan's real purpose in suggesting that Stearn submit an application on behalf of Ute 1 was to induce Stearn to advance additional and substantial lender fees as part of WEF's and Ryan's scheme to use the proposed lending transaction as an artifice to obtain and keep such advance fees without ever making a loan.

66.     Ryan was also specifically advised by Stearn that although Ute 1 had filed for Chapter 11 bankruptcy protection, that the Bankruptcy Case was in the process of being dismissed and would be dismissed before any loan was finalized.

67.     Ryan indicated the existence of the Bankruptcy Case and its impeding dismissal was not a significant issue.  Ryan advised Stearn that WEF was interested in making loans for both Homes.

68.     In discussions with Ryan, Stearn made it clear that the contemplated loans had to be treated separately.  Each of the Homes had separate ownership.  Stearn advised that it was uncertain when the Ute 1 issues in the Pitkin Case and the Bankruptcy Case would be resolved, but that the Ute 2 private money loan was on a specific timetable; while the Ute 1 issues were a

movable piece, the Ute 2 issues were not.  Stearn did not want the loans to be linked so that if there was an issue with one loan, it would not impact the other loan.

69.     Ryan represented that the loans would be treated separately by WEF.  This representation was false, because Ryan always intended to treat the loans together and claim a breach of both loans in order to keep all of the advance fees that Plaintiffs paid.

70.     On or about December 15, 2015, Stearn submitted an application for construction financing in the amount of $11 million to complete the Ute 1 Home.

71.     Plaintiffs remained concerned about paying the substantial advance lender fees WEF was demanding as part of its commitment, particularly if the loan did not close, or loan documentation could not be agreed upon by the parties. Plaintiffs wanted to confirm the circumstances where the fees would be refunded.

72.     Again, Ryan represented that the substantial lender fees were necessary since WEF placed a hold on the funds to be lent and reflected the non-use of the capital during the due diligence period before loan disbursal. This representation was false.

73.     WEF provided one additional reference, an attorney in California who was dealing with WEF in a loan transaction that had not yet closed.  Again, the reference was not substantive since the reference was unable to comment on any loan that had actually been made by WEF.

74.     Throughout December, the parties directly and through their representatives negotiated the terms of the proposed loan commitments.

75.     On or about January 11, 2016, the parties entered into a "Letter of Intent for Standard Commitment" for a proposed loan in the amount of $25 million for the Ute 2 Home.

76.     The "Letters of Intent" were part of WEF's scheme and, like its "due diligence" were perfunctory and used to make the loan transaction appear legitimate.

77.     On or about January 11, 2016, the parties entered into a "Letter of Intent for Standard Commitment" for a proposed loan in the amount of $11 million for the Ute 1 Home.

78.     Three days later, on January 14, 2016, Ryan advised Plaintiffs that they had complied with the initial terms of the Letters of Intent, and on January 15, 2016, presented Plaintiffs with two separate standard "Loan Commitments" one for Ute 1 and one for Ute 2.

79.     Pursuant to instructions from Ryan, Plaintiffs' broker created a Dropbox where all compliance documentation was to be uploaded by Plaintiffs for what Ryan represented was WEF's "underwriting department" to review materials as part of WEF's purported due diligence.

80.     The parties then negotiated the terms of the Loan Commitments for the Ute 1 loan and the Ute 2 loan. Stearn, his broker and attorney dealt directly with both counsel for WEF and Ryan.

81.     Stearn and his counsel were both located in Colorado at the time of the communications and, on information and belief, Defendant and its representatives, including its attorneys, knew that Stearn was located in Colorado at the time of such negotiations.

82.     On January 29, 2016 the parties agreed upon the terms of Amended Loan Commitments which were signed by Stearn in Colorado and transmitted to WEF and its representatives by e-mail.

83.     With respect to the Amended Loan Commitment for the Ute 1 Home, the agreement provided among other things as follows:

            a.  In the event this Commitment is cancelled by the Lender pursuant to
                paragraph 6 hereof, because of the failure for any reasons of the Borrower

or Guarantor to satisfy any of the conditions precedent herein or requirements hereof or the material inaccuracy of any information provided to the Lender by the Borrower or Guarantor the Deposit on the Lenders Administration Fee/ Loan Fee shall be retained by the Lender as liquidated damages, and not as a penalty, without prejudice to the right of the Lender to Claim such further and other obligations as it may sustain by reason of the cancellation of the Commitment.   It is agreed that the Deposit on the Lenders Administration Fee/ Loan Fee represents the reasonable cost of the Lender's work and expenses in underwriting this loan and that it is not a penalty. (Emphasis in original)

b.   "Upon acceptance of this Commitment, the Borrower shall pay to the Lender by certified wire transfer a deposit on the Lenders Administration/Loan Fee of $55,000 USD ("Deposit on the Lenders Administration Fee/Loan Fee").

c.   "In the event the Lender fails to close the transaction notwithstanding that the Borrower has not breached any term or requirement herein, then all fees paid by Borrower or Guarantor shall be refunded to the Borrower without interest, save and except for any third party costs, including and not limited to Appraisal fees, Phase One Environmental Fees and any CPA fees that may be incurred on the consent of the Borrower."

d.   "In the event that the Borrower complies with the terms of the commitment yet Westmoreland Equity Fund, LLC declines to fund the transaction, all fees shall be fully refundable (including the fees described in paragraphs 5, 7, 8 and 9 of the Commitment) save and except for any third party costs, including and not limited to Appraisal fees, Phase One Environmental Fees and any CPA fees that may be incurred on the consent of the Borrower."

84.   The Amended Loan Commitment for the Ute 2 Home contained identical terms but required that the advance lender fee be paid in the amount of $125,000.  ("Upon acceptance of this Commitment, the Borrower shall pay to the Lender by certified wire transfer a deposit on the Lenders Administration/Loan Fee of $125,000 USD ("Deposit on the Lenders Administration Fee/Loan Fee").

85.   Contrary to WEF's representations, the lender fees did not represent "the reasonable cost of the lender's work and expenses in underwriting…"  Further, upon information

17

and belief, the lender never placed a "hold" on any funds, and incurred no loss because of the "non-use of capital."

86.     Negotiations continued with respect to the Loan Commitments, even after they were signed and delivered.

87.     Plaintiffs' broker continued to upload documents to the Dropbox for review by WEF.

88.     On information and belief, in January or February, Ryan contacted Feldman and solicited his assistance in a "selling" the loan scam, which would net significant advance lender fees that Ryan and WEF had every intention of keeping relating to a loan Ryan and WEF had no intention of making.

89.     On information and belief, Defendant Feldman received a substantial payment in exchange for his agreement to add legitimacy to the scam by purporting to act as WEF's independent agent for purposes of conducting due diligence and later supporting termination of the loan commitments or pretextual grounds to be determined.

90.     As the purported due diligence process progressed in February, 2016, WEF sent Feldman to Colorado to meet with Stearn and inspect the Ute 1 Home and the Ute 2 Home.

91.     Feldman met with Stearn at the Homes in Aspen and spent about 10 hours with Stearn discussing the Homes, as well as the status of the private money loans, the Pitkin Case and the Ute 1 Bankruptcy Case.

92.     Feldman represented to Stearn that he was Ryan's "eyes and ears" on the transactions with Plaintiffs.  He represented to Stearn that he did inspections like the one he was doing for WEF and Ryan for a number of other clients.  Feldman represented that he was a

retired attorney but still practiced and was in good standing in the State of Florida.   He represented that he had done work for WEF for an undisclosed period of time, and had closed a lot of deals with Ryan.

93.     In truth and in fact, Feldman had been disbarred by the State of Florida and could not practice law there or anywhere else.

94.     Nevertheless, Feldman played an important role in the illusion of due diligence that WEF and Ryan intended to create as part of the scam.  He gave personalized legitimacy to WEF and Ryan and became the face of the scam having met with Stearn for an entire day.

95.     Stearn provided significant information to Feldman which was accurate and comported with Plaintiffs' obligations under the loan commitments.  Feldman, during his in-person interview with Stearn, asked Stearn questions and had every opportunity to obtain information from Stearn.  Subsequently, Feldman asked follow-up questions by phone or through email to which Stearn accurately responded.  Feldman advised Stearn that the Dropbox file was in great shape and that disclosures were the type of details they expected in such a transaction.

96.     Any corrections or clarifications regarding information on the Ute 1 and Ute 2 loan applications and disclosures were discussed with Feldman, clarified with him and/or placed in the Dropbox and such corrections or changes were accepted by WEF.

97.     Through e-mails, the parties reached agreement on changes and modifications to the Amended Commitments.

98.     Ryan insisted upon having Second Amended Commitments signed for each property, despite suggestions by Plaintiffs' counsel that having already agreed on modifications in writing as represented in the e-mails, the parties should be working on loan documentation so

the loan could close timely, particularly since WEF and Ryan were well aware of the need to complete refinancing on the UTE 2 loan by the end of March 2016.

99.     Ryan's insistence was merely an effort to delay the fast approaching closing date.

100.    Nevertheless, on March 1, 2016, Stearn signed Second Amended Loan Commitments for the Ute 1 loan and the Ute 2 loan. Each of the Second Amended Commitments provided for the same lender fee to be paid and revised certain language concerning refundable amounts to Plaintiffs if WEF cancelled the Commitments, as follows:

> "If closing does not occur on March 15, 2016, and Borrower has not breached the conditions and terms of the executed commitment, Westmoreland will return to Borrower 100% of fees paid by Borrower, except for fees paid by Borrower to pay third party costs, such as attorney's fees, appraisal, survey, environmental report, track searches, title commitment, title insurance, and any other third party cost."

101.    Plaintiffs continued to upload documents to the Dropbox that WEF insisted upon for use in its purported due diligence.  Plaintiffs provided among other things: (1) letters of explanation regarding the Pitkin case; (2) documentation regarding the Bankruptcy Case and dismissal of the Ute 1 bankruptcy; (3) orders in the Pitkin Case; (4) documents responsive to title work exceptions, such as removal of mechanic lien filings; and (5) documentation concerning the private money loan on the Ute 2 Home.

102.    WEF and Ryan meanwhile had intentionally failed to properly instruct it appraiser regarding the necessity for completing the appraisal by March 15, 2016.  Ryan advised the appraiser to complete it by March 22, 2016, a week after the closing date called for under the loan commitments.

103.    WEF's and Ryan's lackadaisical approach to the appraisal supports the conclusion that WEF and Ryan did not intend to timely close on the loan transaction or fund the loans.

104.    In addition, at Defendant Feldman's urging, Stearn contacted Ryan and inquired about providing the appraiser with prior appraisals and information, including comparables, concerning the unique Aspen market.

105.    Plaintiffs had previously had the property appraised and were intimately familiar with the market, as was their Aspen real estate broker.

106.    Defendant Ryan feigned concern and even outrage that Plaintiffs were attempting to load documents into the Dropbox which he claimed would negatively impact the independence of the appraisal from its agent.

107.    Of course, Plaintiffs never loaded anything to Dropbox, they simply requested authority to do so at Defendant Feldman's urging in an attempt to speed up the process and provide relevant information regarding the properties.

108.    Further, contrary to his own stated concerns about the neutrality of the appraiser, on information and belief, Ryan contacted the appraiser and provided information or data designed to affect the appraiser's opinion in a deliberate effort to have the appraisals come in low to help justify termination of the loan commitments.

109.    During this same time period, Plaintiffs were continually pushing to have the appraisal completed.

110.    By mid-March, 2016, Ryan and WEF, in accordance with their plan and intent from the inception of the loan commitments, were looking for a way to terminate the proposed

construction financing for Ute 1 and the take out financing for Ute 2 in a manner that would allow it to retain the advance lender fees.

111.     On information and belief, WEF never set aside the necessary capital to make the loans called for by the loan commitments.  As they intended from the beginning, WEF and Ryan instead worked to create a pretextual bases to avoid WEF's obligation to fund the loans under the loan commitments, as well as to justify retaining $235,800 of advance lender fees.

112.     To accomplish their objective, Ryan and WEF needed to claim that Plaintiffs breached each of the loan commitments separately, otherwise the advance lender fees for one or both loans would be refundable.

113.     Ryan decided to use the status of the Ute 2 loan with the private money lender to claim that improper, or inadequate, disclosure had been made.  Ryan claimed that although the Forbearance Agreement with the private money lender had been placed in the Dropbox, Stearn never advised him that the status of the loan was in forbearance.  Ryan pretended to be outraged by this alleged omission.  He claimed Stearn should have told him what the status of the private money loan was, whether documents were deposited in Dropbox or not, and that failing to do so misled him.  In truth and in fact, Stearn had properly advised Ryan of the status of the loan and properly disclosed such documentation.  Ryan's "outrage" was an act in furtherance of WEF's scheme.  Stearn reasonably believed he had complied with his duty to disclose by depositing the actual documents in the drop box for WEF's review.

114.     Ryan then claimed that Stearn failed to disclose the Ute 1 Bankruptcy case. Again, Ryan feigned outrage.

115.    Based on the foregoing, Ryan claimed Plaintiffs breached the loan commitments and that the advance lender fees would be retained.  Ryan's and WEF's plan and intent from the beginning had been realized.

116.    Ryan promised a detailed letter of explanation to follow.

117.    As previously discussed with Feldman as part of their plan, Ryan had Feldman prepare a written "Supplementary Underwriting Review" regarding Feldman's alleged due diligence in an effort to legitimize both the termination of the loan commitments based on Plaintiffs' alleged breaches and the retention of the advance lender fees.

118.    Stearn attempted to keep the deal together, and at best the Ute 2 loan, but Ryan continued to express artificial outrage.

119.    On April 22, 2016, in an effort to justify keeping the advance lender fees of $235,800, and in keeping with WEF's and Ryan's secret plan and intent never to make the loans as called for by the loan commitments, Ryan provided an explanation letter, which included Feldman's letter/report claiming that Plaintiffs had breached each loan commitment and attempting to justify WEF's conduct as follows:

a. Ryan feigned a lack of knowledge of Ute 1's Chapter 11 Bankruptcy Case and claimed that entering into a loan commitment while the Bankruptcy Case was pending was a breach, despite the fact that (1) Ryan and WEF were aware of the Bankruptcy Case as early as December, 2015 in discussions with Stearn; (2) the Bankruptcy Case was dismissed; and (3) even a rudimentary internet search would reveal the existence of the Bankruptcy Case which, on information and belief Ryan or another employee or agent of WEF did prior to signing the loan commitments;

b. WEF and Ryan feigned a lack of knowledge and expressed phony concern that Ute 2 had a Forbearance Agreement with its private money lender which it claimed was a breach of the loan commitments, despite the fact that (1) all agreements regarding the private money loan, were placed in the Dropbox folder; (2) Ute 2 and Stearn were not in default of that

agreement; and (3) the intent of the loan transaction on Ute 2 was to pay off the private money lender, and there were no other liens against title;

c.   WEF and Ryan asserted that Ute 1 and Ute 2 had failed to and did not have the ability to provide WEF with a first lien position which was a breach of the loan commitments, despite the fact that this request did not need to be met until closing and would and could be met at closing.

120.   Ryan also claimed that the loan commitments were being terminated because the appraisals did not meet the criteria called for in the agreements.  On information and belief, Ryan intentionally impacted the appraisals by comments or information intended to affect value.

121.   In any event, the issue of value as a basis for termination was not only a sham, it was contrary to the procedure outlined in the loan commitments.  Pursuant to the loan commitments, if the appraisal did not support value, Plaintiffs could object to the opposed value and subject the same to a peer review.  In their haste to abscond with Plaintiff's money, Ryan and WEF ignored this procedure.

122.   Each of the claimed reasons by Ryan for WEF not to make either loan was a pretext, just as Ryan and WEF had planned when they induced Stearn, Ute 1 and Ute 2 to enter into the loan commitments, and advance huge lender fees.

123.   Each of the purported grounds relied upon by Ryan and WEF to terminate the loan commitments, except the appraisals, were represented to be a breach of the loan commitments by Plaintiffs, so that WEF could retain the advance lender fees and rely on such purported breaches as justification for doing so.

124.   The failure of the appraisals to come in at the values required under the loan contracts was planned by Ryan and asserted as a basis for termination of the loan contracts to give the termination of the transactions an air of legitimacy.

125.     In truth and in fact, Ryan and WEF had actual knowledge of the facts relied upon to claim a breach by Plaintiffs at the inception of the relationship and at the time Plaintiffs signed the loan commitments.

126.     Furthermore, the claimed breaches by Plaintiffs were not material to the transaction and would have been resolved or eliminated at closing.

127.     WEF and Ryan induced Plaintiffs to pay substantial advance lender fees without disclosing their secret intent at the time of contracting to terminate the loan commitments and retain the fees.

128.     Plaintiffs have been damaged as a direct and proximate result of WEF's and Ryan's conduct.

## FIRST CLAIM FOR RELIEF
### (Fraud - *Plaintiffs v. WEF and Ryan*)

129.     Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

130.     WEF and Ryan made misrepresentations of present or past material facts to Plaintiffs, including without limitation: (a) that it had the capacity and ability to loan money to Plaintiffs; (b) that it was willing to loan money to Plaintiffs pursuant to the loan commitments; (c) that it would return the substantial advance lender fees to Plaintiffs if the loans didn't close, and Plaintiffs didn't breach; (d) that it would treat the two loans separately; and (e) it would conduct due diligence in good faith with the intent of closing the loan and transactions and funding the loans.

131.     The proposed loan transactions were a sham intended to induce Plaintiffs to advance substantial lender fees that WEF and Ryan never intended to return.

132.    The representations made by WEF and Ryan were false.   At the time the representations were made, at the time of contracting, Defendants had the present intent  to never make a loan to Plaintiffs and then to permanently deprive Plaintiffs of their money by retaining the advance lender fee on pretextual grounds as part of their plan and secret and undisclosed intent.

133.    Defendants made misrepresentations to Plaintiffs with the specific intent that Plaintiffs would rely on the representations.

134.    Plaintiffs relied upon Defendants' representations and were induced to sign loan commitments and pay $235,800 in advance loan fees based upon such reliance.

135.    Plaintiffs' reliance was justified.

136.    Plaintiffs have been damaged as a direct and proximate result of being fraudulently induced to enter into two separate loan transactions and pay advance lender fees in an amount to be determined at trial.

WHEREFORE, Based on their First Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendants Westmoreland Equity Fund, LLC and Ed Ryan, jointly and severally, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the Court deems just.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Concealment - *Plaintiffs v. WEF and Ryan*)

137.    Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

138.    Ryan and WEF concealed past or present facts from Plaintiffs that in equity and good conscience they had a duty to disclose, including (1) their present intent not to make any

loans to Plaintiffs at the time of entering into the loan commitments; (2) their present intent at the time of entering into the loan commitments to later claim a breach of the loan commitments on the part of Plaintiffs on pretextual grounds; and (3) their present intent, at the time of entering into the loan commitments, to never return advance lender fees.

139.    The concealed facts were material.

140.    Defendants concealed and/or failed to disclose the material facts with the intent of creating a false impression of the actual facts in the mind of the Plaintiffs.

141.    Defendants concealed and/or failed to disclose the material facts with the intent that Plaintiffs take a course of action they would not have taken had they known the true facts.

142.    Plaintiffs acted relying on the assumption that the concealed/undisclosed facts did not exist or were different from what they actually were.

143.    Plaintiffs' reliance was justified.

144.    As a direct and proximate result of Plaintiffs' reliance they have been damaged in an amount to be determined at trial.

WHEREFORE, Based on their Second Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendants Westmoreland Equity Fund, LLC and Ed Ryan, jointly and severally, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the Court deems just.

### THIRD CLAIM FOR RELIEF
**(Civil Theft § 18-4-405, C.R.S. - *Plaintiffs v. WEF, Ryan and Feldman*)**

145.    Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

146.     The purported loan transactions were a ruse, and subterfuge through which WEF and Ryan planned to retain advanced lender fees paid by Defendants, to permanently deprive Plaintiffs of their money.

147.     Defendants obtained control over Plaintiffs' money by deceit, and with the specific intent to permanently deprive Plaintiffs of the money.

148.     Though monies were provided to Defendants by Plaintiffs voluntarily under the false belief that Defendants were willing and able to make the loans addressed in the loan commitments, Defendants retained Plaintiffs' money, without authority, when they refused to return the advance lender fees on pretextual grounds.

149.     Defendants' conduct constitutes theft.

150.     Upon information and belief, Feldman received a substantial portion of the stolen money.

151.     Plaintiffs have been damaged by Defendants' theft of money.

152.     Pursuant to the provisions of §18-4-405, C.R.S., Plaintiffs are entitled to treble damages, attorneys' fees and costs.

WHEREFORE, based on their Third Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendants Westmoreland Equity Fund LLC, Ed Ryan, and Feldman, jointly and severally, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the court deems just.

### FOURTH CLAIM FOR RELIEF
(Conversion - *Plaintiffs v. WEF and Ryan*)

153.     Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

154.    The loan transaction was a sham.

155.    Defendants received $235,800 of Plaintiffs' money which Plaintiffs paid as advance lender fees.

156.    Defendants had no authorization to accept Plaintiffs money as part of a sham transaction.

157.    Defendants retain Plaintiffs' money and exercise unauthorized dominion and control over such money.

158.    Plaintiffs have been damaged as a direct and proximate result of Defendants' conversion of their money.

WHEREFORE, based on their Fourth Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendants Westmoreland Equity Fund LLC and Ed Ryan, jointly and severally, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the court deems just.

## FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy – *Plaintiffs v. WEF, Ryan and Feldman*)

159.    Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

160.    WEF, Ryan and Feldman consciously conspired and pursued a common plan or design through one or more unlawful acts as alleged herein.

161.    Specifically, and without limitation, the common plan or design pursued by WEF, Ryan and Feldman included: (a) creating a loan scam by, among other things, giving Plaintiffs the appearance of legitimate people who were able to fund a legitimate loan transaction and due diligence; (b) inducing Plaintiffs to pay significant advance lender fees as the object of the

common plan or design with the intent to return the lender fees advanced and not to fund the loan; and (c) concocting grounds for terminating the loan commitments, and justifying keeping the funds advanced.

162.    Pursuant to their unity of interest conspiracy and concerted action, WEF, Ryan and Feldman pursued a course of action that was predicated on fraudulent inducement and fraudulent concealment as alleged herein.

163.    WEF, Ryan and Feldman had a meeting of the minds and an express or tacit agreement on their course of action constituting their civil conspiracy as alleged herein.

164.    WEF, Ryan and Feldman committed numerous unlawful covert acts in furtherance of the conspiracy, including without limitation, making false representations and concealing material information as described herein.

165.    WEF, Ryan and Feldman conspired and deliberately pursued a common plan or design to commit a tortious act within the meaning of § 13-21-111.5(4), C.R.S. rendering them jointly liable for all damages sustained by Plaintiffs.

166.    As a direct and proximate result of Defendants civil conspiracy, Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE, based on their Fifth Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendants Westmoreland Equity Fund LLC, Ed Ryan, and Bernard Feldman, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the court deems just.

**SIXTH CLAIM FOR RELIEF**
**(Alternative Claim for Breach of Contract - *Plaintiffs v. WEF*)**

167.    Plaintiffs incorporate all previous paragraphs of the Complaint and Jury Demand as if fully set forth herein.

168.    Plaintiffs and WEF entered into two separate express contracts in the form of loan commitments.

169.    Plaintiffs, pursuant to the loan commitments paid WEF a total of $235,800 in advance lender fees.

170.    Plaintiffs substantially performed as required under the loan commitments.

171.    WEF did not close the loans and has failed and refused to return to Plaintiffs all or a portion of the advance lender fees paid under each loan commitment.

172.    WEF also had an implied obligation of good faith and fair dealing under the loan commitments.

173.    WEF breached each of the loan commitments by refusing to close, claiming Plaintiffs breached the loan commitments and by failing to return all, or a portion, of the advance lender fees paid under the loan commitments.

174.    The loan commitments contained covenants of good faith and fair dealing requiring honesty in fact in the transactions involving the loan commitments.

175.    WEF breached its obligations of good faith and fair dealing by, without limitation, failing to properly perform its due diligence, intentionally delaying the appraisals, failing to follow the procedures for an objectionable appraisal, failing to review its Dropbox for material information and then claiming Plaintiffs breached the loan commitments, which WEF claimed entitled it to keep advance lender fees.

176.     WEF did not act with faithfulness and to an agreed upon common purpose consistent with the justified expectations of Plaintiffs.

177.     Plaintiffs have been damaged as a direct and proximate result of WEF's breach of contract in an amount to be determined at trial.

WHEREFORE, based on their Sixth Claim for Relief, Plaintiffs pray for judgment in their favor and against Defendant Westmoreland Equity Fund LLC, in an amount to be determined at trial, together with prejudgment interest, attorneys' fees, costs and such other and further relief as the court deems just.

## JURY DEMAND

Plaintiff hereby demands a jury of six (6) on all issues so triable.

Dated this 19th day of May, 2016.

Respectfully submitted,

PODOLL & PODOLL, P.C.

By:  s/Richard B. Podoll
        Richard B. Podoll
        Robert A. Kitsmiller
        5619 DTC Parkway, Suite 1100
        Greenwood Village, Colorado 80111
        Telephone: (303) 861-4000
        Facsimile: (303) 861-4004
        Email: rich@podoll.net
        Email: bob@podoll.net
        *Attorneys for Plaintiffs*

**Plaintiffs' Address**:
Leathem Stearn
999 South Ute Avenue
Aspen, Colorado 81611

Ute Mesa Lot 1, LLC
Ute Mesa Lot 2, LLC
1001 South Ute Avenue

Aspen, Colorado 81611